# Exhibit B

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 2 of 23 PageID #: 114



# How Trump Purged Immigration Judges to Speed Up Deportations

Case 2:26-cv-02114-NJC Document 11-2 Filed 04/14/26 Page 3 of 23 PageID #: 115

Judges are ordering an unprecedented number of people deported after coming under significant pressure from the administration to do so or risk losing their jobs.

 Listen · 16:58 min

    

By Nicholas Nehamas, Allison McCann, Steven Rich, Jazmine Ulloa and Hamed Aleaziz

The reporters interviewed more than 85 people, including immigration judges, administration officials, asylum seekers and lawyers, and analyzed data on millions of immigration court cases dating back to 2009.

April 9, 2026

The Trump administration has systematically pressured the nation's immigration judges, threatening them with disciplinary action if they do not deport more people and firing those seen as insufficiently supportive of the president's aggressive enforcement agenda, a New York Times investigation has found.

The overhaul of the immigration courts has been far less visible than the militarized deportation raids that President Trump scaled back after public protest. But the effort has helped reshape a hugely consequential, if little-known, corner of the government that the administration is harnessing to advance its mass-deportation policies.

Although they wear robes and are required by law to exercise "independent judgment," immigration judges are not part of the judicial branch. Instead they work for the Justice Department, under Mr. Trump's ultimate command, and can be fired. One of their main duties is deciding whether undocumented immigrants should be deported or granted a form of legal status like asylum and be allowed to remain in the country.

So far, the Trump administration has dismissed more than 100 immigration judges out of about 750 in place when Mr. Trump returned to power, an unprecedented purge.

Case 2:26-cv-02114-NJC   Document 11-2   Filed 04/14/26   Page 4 of 23 PageID #: 116

At the same time, the administration has reshaped the immigration bench, announcing the appointments of 143 permanent and temporary judges, including many who previously worked as immigration prosecutors for the Department of Homeland Security or as military lawyers.

By many measures, the administration is achieving its goals. The number of people being ordered deported has risen sharply, while judges have approved asylum claims in fewer than 10 percent of cases this year, the lowest rate for which data is available, The Times found.



**Asylum grant rates have plummeted**

Average monthly rate for decided asylum cases.

Note: Data reflects a three-month rolling average.  Source: Executive Office for Immigration Review.  Allison McCann/The New York Times

In interviews, more than two dozen immigration judges who have served under the second Trump administration described feeling a consistent sense of pressure to deport immigrants or risk losing their jobs.

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 5 of 23 PageID #: 117

"All of us are looking over our shoulders," said Holly D'Andrea, an immigration judge in Texas who was appointed during the first Trump administration. She spoke with The Times in her capacity as president of the National Association of Immigration Judges, a labor union.

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 6 of 23 PageID #: 118



Holly D'Andrea in Conroe, Texas.    Desiree Rios for The New York Times

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 7 of 23 PageID #: 119

The transformation of the courts reflects how the administration, under the watchful eye of Stephen Miller, a top White House adviser, has tried to fundamentally rewire an immigration system that Mr. Miller has long argued is too welcoming.

The effort stems from the administration's view — as articulated by Mr. Miller — that many undocumented immigrants should no longer receive a constitutional right of due process as they seek legal status.

"The only process invaders are due is deportation," Mr. Miller wrote on X last year.

During Mr. Trump's second term, White House and Justice Department officials have carefully monitored judges' rulings, examining statistics showing how often they have granted asylum, according to two federal government employees with knowledge of the activity who spoke on condition of anonymity for fear of retaliation.

The administration has instructed judges to stop granting bond to immigrants who crossed the border illegally, a change from decades of practice. The new policy has required people to remain in detention for extended periods even if they do not have a criminal record and have lived in the country for years.

Immigration lawyers say that many of their clients have agreed to leave the country rather than stay locked up. The Times found that the number of people in custody abandoning their cases has risen sharply.

Administration officials have expressed their expectations in stark terms, according to several current and former judges.

Last June, a senior Justice Department official published a memo accusing some judges of tolerating bias as long as it was "in favor of an alien" and against the government. The official warned that judges who favored one side "may be subject to corrective or disciplinary action."

## More immigration cases are ending in removal orders



Notes: For two years during the Covid-19 pandemic, most immigration courts were largely closed. Data reflects a three-month rolling average.  Source: Executive Office for Immigration Review.  Allison McCann/The New York Times

Other officials are said to have instructed judges to grant asylum only in the most extraordinary circumstances. In a previously unreported whistle-blower letter to Congress, one fired judge quoted an official remarking on the standard for asylum: "Maybe if you were Jewish and escaping Nazi Germany in 1943, you should get it." The whistle-blower is a military lawyer who was detailed to serve as a temporary immigration judge and subsequently dismissed.

The administration has also made its priorities clear in recruitment ads, seeking applicants who wish to work as "deportation judges."

Supporters and critics of immigration have agreed for years that the courts have become dysfunctional as more immigrants have entered the United States asking for asylum. Under President Joseph R. Biden Jr., claims piled up as his administration made it easier for asylum seekers to cross the border, helping generate a total backlog of more than three million cases.

Last year, as judges resolved claims more rapidly under Mr. Trump, the backlog fell for the first time in at least two decades. It has continued to decline.

"Biden's open border policies effectively turned the asylum system into a broken revolving door," said Chad Gilmartin, a Justice Department spokesman, adding that many entrants under Mr. Biden had "no legitimate claims of government persecution."

The Trump administration, Mr. Gilmartin said, was conducting "re-evaluations of personnel and processes to deliver a better system."

In response to the whistle-blower's account, Mr. Gilmartin said the comment that asylum should be limited to people facing a crisis like Jews who fled Nazi Germany was "unverified." He also said it "does not represent an official position of this D.O.J."

He did not explain how the Justice Department chose which judges to fire.

Abigail Jackson, a White House spokeswoman, said that "the American people elected President Trump based on his promise to enforce federal immigration law."

Presidents from both parties have tried to bring immigration court decisions in line with their policies. But typically no more than a few judges have been fired in a given year, according to interviews with union officials and immigration experts. In 2022, the Biden administration fired at least six Trump-appointed judges, drawing outrage from Republicans.

The Times's analysis found that judges ruling against Biden-era arrivals explained only part of the dramatic decline in immigrants receiving asylum. Under Mr. Trump, judges have ruled more aggressively against people who came to the United States before then, too.

### Most immigration judges are granting asylum less often

The chart shows the number of judges granting asylum at a given rate in the second Trump presidency compared with the Biden presidency.



Notes: Data includes judges who ruled on at least 50 cases. To account for the near closure of the courts during the Covid-19 pandemic, asylum grant rates were calculated for the period from April 1, 2023, through Jan. 19, 2025, for the Biden presidency. Source: Executive Office for Immigration Review. Allison McCann/The New York Times

The job of an immigration judge is hardly glamorous.

There are more than 70 courts around the country, some located in detention centers, others in modest federal office buildings. Some are entirely virtual.

"You're a bureaucrat," said David Koelsch, who retired last year. "You're not a lofty judge sitting in some sort of oak-walled chamber. You're doing a bread-and-butter job on an assembly line."

Case 2:26-cv-02114-NJC   Document 11-2   Filed 04/14/26   Page 11 of 23 PageID #: 123



David Koelsch at his home in Baltimore.   Demetrius Freeman for The New York Times

The Justice Department established the courts in their current form in 1983. They are administrative, not criminal, similar to the handling of tax disputes. There are no juries, and immigrants often represent themselves.

Under the Refugee Act of 1980, judges can grant asylum only to those fleeing persecution on account of religion, race, nationality, political opinion or membership in "a particular social group."

But many migrants today are fleeing situations that may not qualify them for asylum, such as poverty, climate change and violence. They have few other legal pathways to seek status in the United States.

Asylum seekers often wait years for a hearing on their claims. The delays have created an incentive for more migration, as people are allowed to work — and establish roots — in the country before their cases are decided, immigration

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 12 of 23 PageID #: 124

experts across the political spectrum have said.

Judges ultimately deny many of their claims.

"Our asylum system is fundamentally broken," said Blas Nuñez-Neto, a former senior Department of Homeland Security official under Mr. Biden.

Mr. Trump started firing immigration judges almost as soon as he returned to office, removing four top court officials, including the chief judge, on the day of his inauguration.

Over the following year, the Justice Department regularly fired waves of judges with little notice or stated reason. Some have sued, claiming discrimination or that their civil service protections were violated. Dozens of others have quit or retired.

The overhaul is unfolding in real time: More dismissals happened last week, while the administration announced 32 hires on Wednesday.

Shuting Chen, an immigration judge fired last November, said the administration wanted judges to act as "puppets for the administration with a singular goal of deporting as many people as possible as quickly as possible."

Case 2:26-cv-02114-NJC   Document 11-2   Filed 04/14/26   Page 13 of 23 PageID #: 125



Shuting Chen at her home in San Francisco.  Laura Morton for The New York Times

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 14 of 23 PageID #: 126

The Times analysis found that many of the judges fired under Mr. Trump shared a similar profile. Almost all had been appointed under Democratic administrations. More than half had previously worked as attorneys representing immigrants. And the vast majority had granted asylum at higher rates than their peers who kept their jobs.

Before being dismissed, fired judges granted asylum to 46 percent of applicants during the current administration, well above the 15 percent grant rate for those who have remained. The president's new hires have granted asylum even less often, in roughly 6 percent of cases.

The administration has focused especially on courts seen as more friendly to immigrants. After firing more than half of San Francisco's 21 judges, the Justice Department moved to shut down the main courthouse there.



The Justice Department has moved to shut down the main immigration courthouse in San Francisco after firing more than half of its judges. Laura Morton for The New York Times

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 15 of 23 PageID #: 127

In another courthouse in Massachusetts, there were so many goodbye parties that a black banner imprinted with colorful balloons was left up in the break room. It read: "We will miss you."

During Mr. Trump's first term, many judges said they were pushed to rule faster, with officials setting quotas on how many cases they heard. But none of them described experiencing anything like the current pressure.

"It's a dismantling of the court system," said Jeremiah Johnson, one of the fired San Francisco judges.

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 16 of 23 PageID #: 128



Jeremiah Johnson in San Francisco.  Cayce Clifford for The New York Times

Judges told The Times that they were particularly alarmed by communications from Trump officials, including a series of memos from Sirce Owen, who served as the acting director of the Executive Office for Immigration Review, the unit at the Justice Department that runs the courts.

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 17 of 23 PageID #: 129

Ms. Owen wrote the June 2025 memo threatening disciplinary action against judges she accused of exhibiting "bias" against the Department of Homeland Security, which represents the government in court.

Carla Espinoza, a Chicago judge fired two weeks after the memo was sent out, said that she and her colleagues interpreted it as "telling us: 'You should be more friendly to the government.'"

Case 2:26-cv-02114-NJC    Document 11-2    Filed 04/14/26    Page 18 of 23 PageID #: 130



Carla Espinoza at home in Chicago.  Jamie Kelter Davis for The New York Times

Mr. Gilmartin, the Justice Department spokesman, said the memo "does not tell judges to rule in favor of either party." Ms. Owen declined to comment.

The message has also gone out to newly hired judges, according to Christopher Day, a lieutenant colonel in the U.S. Army Reserve Judge Advocate General's Corps who was appointed as a temporary immigration judge last October but fired within two months.

In a whistle-blower letter to Congress, Mr. Day claimed that Daren Margolin, who replaced Ms. Owen as the director of the courts, had pressured new judges during training sessions to deny claims. "Mr. Margolin stated that while immigration judges (IJs) had 'judicial autonomy,' they had fired almost 100 judges to date and were watching new judges very carefully," he wrote.

Before his firing, Mr. Day, who had served as an associate general counsel at the Federal Communications Commission during the Biden administration, granted asylum at a far higher rate than every other temporary judge, the Times analysis found.

Through his attorney, Mr. Day declined to comment. The Justice Department did not comment on his description of Mr. Margolin's statements. Mr. Margolin did not respond to a request for comment.

Some of the new hires have had little if any experience in immigration law, a change from past appointees.

Robyn Ross worked on Robert F. Kennedy Jr.'s presidential campaign team. Before that, she served as the research director at Children's Health Defense, the vaccine-skeptical organization founded by Mr. Kennedy, who is now the health and human services secretary. Ms. Ross could not be reached for comment.

One of the administration's most significant changes has been denying bond to many immigrants, as those in custody are more likely to accept deportation.

Under Mr. Trump, immigration judges have been directed to not hold bond hearings for virtually everyone who entered the country illegally.

Previously, judges would grant bond to people they believed were not public safety threats or flight risks. The Times analysis found that since 2009, more than 75 percent of people who were released from custody have attended all their court hearings.

Many detainees have gone to federal court to challenge their detentions. In those courts, judges have repeatedly ruled that the detainees had been unlawfully locked up. The issue could reach the Supreme Court.



## Immigrant detainees are increasingly giving up on their cases

The share of detained immigrants being **granted bond** continues to fall …

… while more detainees are asking for and being **granted voluntary departure**.

Notes: Data reflects a three-month rolling average for both measures. The voluntary departure rate is the number of people being granted voluntary departure as a share of decisions for people in detention. Source: Executive Office for Immigration Review. Allison McCann/The New York Times

Immigration judges can still grant bond hearings to people who entered the country legally, such as those who overstayed visas.

Teresa Riley, the chief immigration judge, has received daily reports about bond rulings, according to a Justice Department official. Her office has sometimes emailed judges asking for an explanation about their decisions to grant bond, three people said. Ms. Riley declined to comment.

One current judge said the "pressure to deny bond is overt." The judge said that there was a requirement to inform a supervisor every time bond was granted, underscoring how closely the administration was monitoring decisions.

Shahrokh Rahimi, 53, has spent the last nine months in immigration detention in Texas under Mr. Trump's new mandatory detention policy. Mr. Rahimi entered the country illegally in 2003. In 2010, an immigration judge ordered him deported, but also prohibited the government from sending him back to his native Iran, saying he would be tortured or persecuted there.

He was allowed to live in the United States under supervised release, if he checked in regularly with Immigration and Customs Enforcement and stayed out of trouble. He is married to a U.S. citizen, has a 12-year-old American-born daughter and does not have a criminal record beyond a speeding ticket, court filings show.

But during Mr. Trump's enforcement crackdown last summer, ICE revoked Mr. Rahimi's release and arrested him. An immigration judge denied him bond.

Case 2:26-cv-02114-NJC Document 11-2 Filed 04/14/26 Page 22 of 23 PageID #: 134



Brandi Rahimi holding a photo of herself and her husband, Shahrokh Rahimi, who was detained by Immigration and Customs Enforcement officials as part of Mr. Trump's enforcement crackdown. Jordan Vonderhaar for The New York Times

Case 2:26-cv-02114-NJC Document 11-2 Filed 04/14/26 Page 23 of 23 PageID #: 135

If he wants to continue his fight for legal status in the United States, he could spend months or even years in immigration detention — a prospect that has convinced many others in his position to give up.

Mr. Rahimi is not ready to make that choice, and not just because he fears imprisonment or worse in Iran.

"My wife is from here," Mr. Rahimi said. "My daughter has a future in this country."

**About the Data**

Reporters analyzed immigration court data published by the Department of Justice's Executive Office for Immigration Review (E.O.I.R.). The reporters used records from 2009, which The Times determined was the first full year with reliable records, through February 2026, the most recent month of data available.

The analyses focus on removal proceedings, which make up 97 percent of all cases initiated since 2009. Asylum grant rates in the analysis refer to the proportion of asylum applications, among completed removal proceedings, that were granted. Because E.O.I.R. data do not include the dates of asylum application decisions, the analyses use a removal proceeding's completion date as a proxy.

The Times also examined changes in case characteristics over time, such as the immigrants' date of entry into the United States, their nationality and their detention status. The Times found that broad declines in asylum grant rates persisted even after adjusting for these factors.

Reporters identified fired, newly hired and temporary judges through interviews, public rosters of judges and Department of Justice press releases.

Christopher Flavelle and Zolan Kanno-Youngs contributed reporting. Research was contributed by Kirsten Noyes, Emily Powell, Kitty Bennett and Georgia Gee.

**Nicholas Nehamas** is a Washington correspondent for The Times, focusing on the Trump administration and its efforts to transform the federal government.

**Allison McCann** is a reporter and graphics editor at The Times who covers immigration.

**Steven Rich** is a data reporter at The Times, using data analysis to investigate major issues and contextualize current events.

**Jazmine Ulloa** is a national reporter covering immigration for The Times.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.