**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SHERIKA WRIGHT,

         *Petitioner*,

 v.

MARKWAYNE MULLIN, *et al.*,

         *Respondents*.

**Case No. 2:26-cv-02114-NJC**

<br>

**PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW**

<br>

Jessica Coffrin-St. Julien
Nhu-Y Ngo
THE BRONX DEFENDERS
360 East 161st Street
Bronx, New York 10451
(646) 780-9930
jcoffrin@bronxdefenders.org
*Counsel for Petitioner*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT....................................................................................................... 2

I. Multiple district courts have applied the *Mathews v. Eldridge* balancing test to hold that detention on the basis of unproven criminal allegations violates a petitioner's procedural due process rights, and their reasoning militates in favor of concluding that Ms. Wright's rights have similarly been infringed. ..................................................... 2

    A.    At least four district courts have applied Mathews to hold that the LRA is unconstitutional as applied to a petitioner detained on the basis of unproven criminal allegations, and the Court should consider their reasoning persuasive...... 4

    B.    At least three district courts have applied the *Mathews* factors to petitioners detained pursuant to the LRA under circumstances distinct from those of Ms. Wright, bolstering the conclusion that this framework should be used to determine the process due to a petitioner held under the statute. ........................... 13

    C.    At least two district courts, resting on flawed, perfunctory analyses of *Demore*, have found that applying the LRA to a petitioner with criminal charges pending at the time of their detention by ICE does not pose a constitutional problem. ...... 16

II. While the Supreme Court in *Demore* authorized mandatory detention under the pre-LRA version of section 1226(c) based largely on congressional findings regarding the flight risk and danger posed by noncitizens with criminal convictions, the legislative history of the LRA does not contain any comparable findings regarding people with pending criminal charges. ......................................................................................... 18

    A.    The Supreme Court's decision in *Demore* rested on a robust congressional record, including studies supported by statistical findings, indicating that noncitizens with certain criminal convictions posed a danger or flight risk. ......... 19

    B.    By contrast, prior to passing the Laken Riley Act in 2025, Congress did not appear to have considered any statistical evidence or made any specific findings as to danger or flight risk posed by noncitizens charged with, but not convicted of, certain crimes.................................................................................. 21

III. Mandatory detention under 8 U.S.C. § 1226(c)(1)(E) would gravely impede Ms. Wright's ability to defend herself against the unproven criminal allegations that ICE uses to justify her detention. .......................................................................... 23

    A.    As a general matter, ICE detention undermines the ability of criminal defendants to vindicate their constitutional rights in criminal court. ..................... 23

    B.    ICE detention profoundly compromises the ability of noncitizens to defend themselves against unproven allegations in Nassau County courts, specifically... 27

    C.    Mandatory ICE detention pursuant to 8 U.S.C. § 1226(c)(1)(E) would inhibit Ms. Wright's ability to defend herself against the unproven criminal allegations against her. .......................................................................................... 29

i

IV. All three *Mathews* factors weigh in favor of finding that subjecting Ms. Wright to mandatory detention on the basis of unproven criminal allegations without any pre-deprivation notice or process violates her procedural due process rights, and the appropriate remedy for that constitutional violation is immediate release. ....................... 32

    A.    The appalling conditions at 26 Federal Plaza, which caused Ms. Wright's mental health to decompensate, illustrate the importance of the liberty interest at stake when one is subject to ICE detention. ........................................................ 32

    B.    Given the difficulties Ms. Wright would likely face in defending herself against unproven criminal allegations while subject to mandatory detention, the risk of erroneous deprivation she faces is exceptionally high. .......................... 35

    C.    The government interest in avoiding the societal costs of unnecessary detention further weighs in Ms. Wright's favor. .................................................................... 37

    D.    The appropriate remedy for Ms. Wright's detention without any pre-deprivation process is release. ............................................................................. 37

CONCLUSION ............................................................................................................................ 38

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Alcantara Guerrero v. Wesling*,
No. 1:26-CV-10928-JEK, 2026 WL 931503 (D. Mass. Apr. 6, 2026) ..............................Passim

*Black v. Decker*,
103 F.4th 133 (2d Cir. 2024) .................................................................................... 3, 6, 15

*Bounds v. Smith*,
430 U.S. 817 (1977) ........................................................................................................ 27

*Brandon Y. M. v. Andrews*,
No. 1:25-CV-01962-SKO (HC), 2026 WL 125234 (E.D. Cal. Jan. 16, 2026) ......................... 11

*Calderon v. Noem*,
No. 2:25-CV-2136-LK-TLF, 2025 WL 3754042 (W.D. Wash. Dec. 29, 2025)......... 3, 4, 17, 18

*Cardoso v. Noem*,
No. 2:25-CV-00968-WJ-JMR, 2026 WL 194626 (D.N.M. Jan. 26, 2026)..................... 3, 4, 16

*Chavez-Alvarez v. Warden York Cnty. Prison*,
783 F.3d 469 (3d Cir. 2015) ............................................................................................ 5

*Coffin v. United States*,
156 U.S. 432 (1895) ......................................................................................................... 7

*Demore v. Kim*,
538 U.S. (2003) .........................................................................................................Passim

*Diop v. ICE/Homeland Sec.*,
656 F.3d 221 (3d Cir. 2011) ............................................................................................ 5

*Doe v. Moniz*,
800 F. Supp. 3d 203 (D. Mass. 2025).............................................................................Passim

*Doe v. U.S. Dep't of Homeland Security*,
No. CV 3:24-259, 2025 WL 360534 (W.D. Pa. Jan. 31, 2025) .............................. 24, 25, 26, 31

*E.C. v. Noem*,
No. 2:25-CV-01789-RFB-BNW, 2025 WL 2916264 (D. Nev. Oct. 14, 2025) ....................... 11

*Gayle v. Warden Monmouth Cnty. Corr. Inst.*,
12 F.4th 321 (3d Cir. 2021) ............................................................................................ 6

*German Santos v. Warden Pike Cnty. Corr. Facility*,
965 F.3d 203 (3d Cir. 2020) ............................................................................................ 6

*Gideon v. Wainwright*,
372 U.S. 335 (1963) ........................................................................................................ 26

*Helbrum v. Williams Olson*,
No. 4:25-CV-00349-SHL-SBJ, 2025 WL 2840273 (S.D. Iowa Sept. 30, 2025) ..................... 11

*Hernandez Lazo v. Noem*,
No. 2:25-CV-6639, 2026 WL 303430 (E.D.N.Y. Feb. 4, 2026).............................................. 32

*Hernandez-Lara v. Lyons*,
10 F.4th 19 (1st Cir. 2021) ........................................................................................Passim

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ................................................................................................ 5, 16, 17

*Jorge S. v. Sec'y of Homeland Sec.*,
No. 18-CV-1842 (SRN/HB), 2018 WL 6332717 (D. Minn. Nov. 15, 2018).......................... 25

*Juan C.R.R. v. Bondi*,
No. CV 26-01282 (MJD/DJF), 2026 WL 752462 (D. Minn. Mar. 17, 2026) .................. 2, 8, 38

*Juan C.R.R. v. Bondi*,
No. 26-CV-1282 (MJD/DJF), 2026 WL 1045254 (D. Minn. Feb. 23, 2026) ..................... 2, 7, 8

*Klopfer v. North Carolina*,
386 U.S. 213 (1967) ............................................................................................................ 27

*Linares Martinez v. Decker*,
No. 18-CV-6527 (JMF), 2018 WL 5023946 (S.D.N.Y. Oct. 17, 2018).................................. 25

*Mathews v. Eldridge*,
424 U.S. 313 (1976) ............................................................................................................ 1

*Matter of Joseph*,
22 I. & N. Dec. 799 (BIA 1999) ......................................................................................... 16

*Mercado v. Noem*,
800 F. Supp. 3d 526 (S.D.N.Y. 2025) ................................................................................ 33

*Minarcaja Concha v. Lyons*,
No. 2:25-CV-6695, 2026 WL 215417 (E.D.N.Y. Jan. 28, 2026)....................................Passim

*Munaf v. Geren*,
533 U.S. 674 (2008) ............................................................................................................ 37

*Nosirov v. Rife*,
No. 2:26-CV-1534, 2026 WL 916602 (E.D. Pa. Apr. 1, 2026)......................................Passim

*Rodriguez Diaz v. Garland*,
53 F.4th 1189 (9th Cir. 2022) ............................................................................................. 3

*Rodriguez-Acurio v. Almodovar*,
811 F. Supp. 3d 274 (E.D.N.Y. 2025) ..........................................................................Passim

*Rueda Torres v. Francis*,
No. 25 Civ. 8408 (DEH), 2025 WL 3168759 (Nov. 13, 2025) ............................................. 11

*S.E. v. Noem*,
No. 26-cv-00356 (DAD/SCR), 2026 WL 206085 (E.D. Cal. Jan. 27, 2026).................. 3, 13, 14

*Sidqui v. Almodovar*,
--- F. Supp. 3d ---, No. 25-CV-9349 (VSB), 2026 WL 251929 (S.D.N.Y. Jan. 30, 2026) ...... 11

*Singh v. Warden, Golden State Annex ICE Det. Facility*,
No. 1:26-CV-00048 DJC SCR, 2026 WL 923808 (E.D. Cal. Apr. 6, 2026) .................. 14, 4, 15

*United States v. Romero*,
511 F.3d 1281 (10th Cir. 2008) .......................................................................................... 16

*Vega v. Arnott*,
No. 6:26-CV-3097-MDH, 2026 WL 482906 (W.D. Mo. Feb. 20, 2026) ............................ 3, 14

*Velasco Lopez v. Decker*,
978 F.3d 842 (2d Cir. 2020) .................................................................................. 15, 25, 32, 37

*Veletanga v. Noem*,
No. 25-CV-9211 (NSR), 2025 WL 3751865 (S.D.N.Y. Dec. 26, 2025) ........................ 3, 14, 15

*Y- C- v. Genalo*,
No. 25-CV-06558 (NCM), 2025 WL 3653496 (E.D.N.Y. Dec. 17, 2025) .............................. 33

**Statutes**

8 U.S.C. § 1182(a)(6)(A) ............................................................................. 4
8 U.S.C. § 1226(a) ..................................................................................... 11
8 U.S.C. § 1226(c) ................................................................... 1, 17, 18, 29
8 U.S.C. § 1226(c)(1)(E)(i) .......................................................................... 4
8 U.S.C. § 1226(c)(1)(E)(ii) ......................................................................... 8
8 U.S.C. § 1357(g) .................................................................................... 28
Cal. Penal Code § 487(a) .......................................................................... 17
Laken Riley Act, Pub. L. 119-1, 139 Stat. 3 (2025) .............................. 1, 27
Mass. Gen. Laws. ch. 265, § 13D ............................................................... 8
N.J. Stat. Ann. § 2C:20-7a ......................................................................... 4
N.Y. Crim. Pro. Law § 150.20 ................................................................... 27
N.Y. Crim. Pro. Law § 150.20(1)(a) .......................................................... 27
N.Y. Crim. Pro. Law § 182.20 ................................................................... 28
N.Y. Crim. Pro. Law § 182.20(1)(c) ..................................................... 29, 31
N.Y. Crim. Pro. Law § 580.30(2) ............................................................... 29
U.S. Const. amend VI ............................................................................... 29

**Other Authorities**

*The Accountability Deficit: When Immigration Detention Obstructs One's Day in Criminal Court*, 125 Colum. L. Rev. 1631 (2025) ............................................... Passim

**PRELIMINARY STATEMENT**

Petitioner, Sherika Wright ("Ms. Wright"), respectfully submits this memorandum of law addressing: (1) caselaw on the scope of the right to procedural due process of people detained under 8 U.S.C. § 1226(c)(1)(E) based on the accusation of a crime without full criminal adjudication; (2) the legislative history of the newly-enacted Laken Riley Act ("LRA"), Pub. L. 119-1, 139 Stat. 3 (2025); (3) the impact of mandatory detention pursuant to § 1226(c)(1)(E) on criminal proceedings against Ms. Wright; and (4) additional facts relating to the factors set forth in *Mathews v. Eldridge*, 424 U.S. 313, 335 (1976), as they relate to Ms. Wright, as well as discussion of the appropriate remedy for the constitutional violation she has suffered. *See* Minute Entry (Apr. 15, 2026).

First, multiple district courts have applied the *Mathews* balancing test to conclude that subjecting a petitioner to mandatory detention under § 1226(c)(1)(E) on the basis of unproven criminal allegations violates their right to procedural due process, and this Court should follow suit. Second, in stark contrast to the congressional record that undergirded the pre-LRA version of § 1226(c), the LRA's legislative history does not contain any empirical data establishing that noncitizens accused, but not convicted, of crimes pose a flight risk or danger to the community. Third, mandatory detention pursuant to § 1226(c)(1)(E) would place Ms. Wright in an impossible bind: detained by U.S. Immigration and Customs and Enforcement ("ICE") due to unproven allegations, yet unable to defend herself against those allegations because she is languishing in ICE detention. Fourth, for precisely that reason, the risk of erroneous deprivation of her liberty under these circumstances is exceptionally high. Further, her liberty interest is particularly heightened notwithstanding the relatively short duration of her detention by ICE because she was subjected to abhorrent conditions while detained at 26 Federal Plaza, which caused her mental

health to rapidly decompensate. And Respondents have not presented any persuasive argument as to why their interest in ensuring Ms. Wright attends her removal proceedings is served by mandatory detention, given that their own evidence establishes that she consistently attended her court appearances and pursued relief in immigration court while at liberty. For all these reasons, the Court should grant Ms. Wright's Petition and order that she remain free from confinement without any restrictions on her liberty.

## ARGUMENT

**I.  Multiple district courts have applied the *Mathews v. Eldridge* balancing test to hold that detention on the basis of unproven criminal allegations violates a petitioner's procedural due process rights, and their reasoning militates in favor of concluding that Ms. Wright's rights have similarly been infringed.**

Here, Petitioner reviews emerging caselaw on the scope of the right to procedural due process held by people detained under the LRA, which was enacted in 2025, due to pending criminal arrests or charges. At least four district courts have applied the *Mathews* factors to petitioners detained on the basis of unproven criminal allegations and concluded that their procedural due process rights were violated. *See Nosirov v. Rife*, No. 2:26-CV-1534, 2026 WL 916602, at *5–*8 (E.D. Pa. Apr. 1, 2026); *Juan C.R.R. v. Bondi*, No. 26-CV-1282 (MJD/DJF), 2026 WL 1045254, at *4–*7 (D. Minn. Feb. 23, 2026), *report and recommendation adopted with modification by C.R.R. v. Bondi*, No. CV 26-01282 (MJD/DJF), 2026 WL 752462 (D. Minn. Mar. 17, 2026); *Alcantara Guerrero v. Wesling*, No. 1:26-CV-10928-JEK, 2026 WL 931503, at *3–*5 (D. Mass. Apr. 6, 2026); *Doe v. Moniz*, 800 F. Supp. 3d 203, 215–17 (D. Mass. 2025). These courts rejected the notion that *Demore v. Kim*, 538 U.S. 501 (2003), foreclosed an as-applied constitutional challenge to mandatory detention under the LRA before such detention had become unconstitutionally prolonged, and, after applying *Mathews* to the circumstances of each petitioner, granted their respective habeas petitions. *See Nosirov*, 2026 WL 916602, at *6–*8; *Juan C.R.R.*,

2026 WL 1045254, at *6–*7; *Alcantara Guerrero*, 2026 WL 931503, at *3–*5; *Doe*, 800 F. Supp. 3d at 215–17.

Additionally, at least three district courts have applied the *Mathews* factors to petitioners detained under the LRA under circumstances slightly distinct to those of Ms. Wright, whether due to the status of their criminal proceedings or duration of their detention, and found that their procedural due process rights had been violated. *See S.E. v. Noem*, No. 26-cv-00356 (DAD/SCR), 2026 WL 206085, at *2–*4 (E.D. Cal. Jan. 27, 2026) (finding due process violation where the local police department declined to prosecute the petitioner following arrest); *Vega v. Arnott*, No. 6:26-CV-3097-MDH, 2026 WL 482906, at *5–*6 (W.D. Mo. Feb. 20, 2026) (finding due process violation where the criminal charges against the petitioner had been dismissed); *Veletanga v. Noem*, No. 25-CV-9211 (NSR), 2025 WL 3751865, at *5–*6 (S.D.N.Y. Dec. 26, 2025) (finding due process violation where the status of the criminal proceedings against the petitioner was unclear but, at over three months, his detention had become unconstitutionally prolonged). Although these decisions analyze situations slightly adjacent to those of Ms. Wright, they bolster the conclusion that the amount of process due to a petitioner detained under the LRA should be determined by applying the flexible *Mathews* framework. *See Black v. Decker*, 103 F.4th 133, 148 (2d Cir. 2024) ("*Mathews* 'remains a flexible test,' and takes account of individual circumstances." (quoting *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022))).

Finally, in flawed decisions that rely on inapposite authority and fail to recognize the dramatic expansion of the immigration detention power wrought by the LRA, at least two district courts have held that applying the LRA to a petitioner with pending criminal charges does not pose a constitutional problem. *See Cardoso v. Noem*, No. 2:25-CV-00968-WJ-JMR, 2026 WL 194626, at *6 (D.N.M. Jan. 26, 2026); *Calderon v. Noem*, No. 2:25-CV-2136-LK-TLF, 2025 WL 3754042,

at *5–*8 (W.D. Wash. Dec. 29, 2025). *Cardoso* relegates its analysis of *Demore* to a few citations, *see Cardoso*, 2026 WL 194626, at *6–*7, while, in *Calderon*, the petitioner did not "raise a constitutional challenge to the LRA," *Calderon*, 2025 WL 375404, at *8. These decisions—marred by limited engagement with *Demore* and, at least in *Calderon*, an apparent failure to squarely plead a challenge to the LRA—should not dissuade the court from regarding the well-reasoned decisions of the *Nosirov*, *Juan C.R.R.*, *Alcantara Guerrero*, and *Doe* courts as instructive in considering Ms. Wright's claim.

> **A.** **At least four district courts have applied Mathews to hold that the LRA is unconstitutional as applied to a petitioner detained on the basis of unproven criminal allegations, and the Court should consider their reasoning persuasive.**
>
> **i.** **The *Nosirov* court ordered the release of a petitioner detained on the basis of pending charges, rejecting the notion that he was not due any further process because his detention had not become unconstitutionally prolonged.**

In *Nosirov*, a decision from the Eastern District of Pennsylvania, the petitioner had been issued a summons for N.J. Stat. Ann. §§ 2C:20-7a (receiving stolen property) and 2C:20-7.1B(1) (fencing or dealing in stolen property). 2026 WL 916602, at *2. The respondents asserted that Mr. Nosirov had been "arrested for" receiving stolen property, and that this offense constituted a statutory predicate mandating detention under the LRA. *Id.*

Although the court rejected the respondents' claim that Mr. Nosirov fell within the scope of the LRA in the first instance,[1] it nonetheless considered "whether Congress may constitutionally

---

[1] The court reached this conclusion on two bases. First, because Mr. Nosirov had been paroled into the United States, the court determined that he was not a person who was inadmissible under 8 U.S.C. § 1182(a)(6)(A), and therefore determined that he fell outside the scope of the LRA's inadmissibility predicates. *See id.* at *3–*4; *see also* 8 U.S.C. § 1226(c)(1)(E)(i) (providing that, for the LRA to apply, a noncitizen must be inadmissible under §§ 1182(6)(A), (6)(C), or (7)). Second, the court held that the respondents had failed to meet their burden to establish that Mr. Nosirov had been "arrested for" a theft offense. *Nosirov*, 2026 WL 916602, at *4–*5. The

require mandatory detention without bond where the asserted trigger is an unresolved state accusation and where no individualized determination of dangerousness or flight risk has been made." *Id.* As a threshold matter, the court rejected the respondents' reliance on *Demore* to justify the petitioner's detention. *Id.* at *6. Although *Demore* "upheld mandatory detention under the prior version of § 1226(c) in the context of a noncitizen who had already been convicted of offenses that Congress identified as serious enough to warrant detention during removal proceedings," "[t]he premise of that decision was that detention attached to a class of noncitizens whose criminal culpability had already been established through ordinary criminal process . . . ." *Id.* Mr. Nosirov, by contrast—like Ms. Wright—had "not been adjudged guilty of the offense on which [r]respondents rely, no immigration judge ha[d] found him dangerous or likely to flee, and the [g]overnment [sought] detention without bond solely because an accusation ha[d] been filed." *Id.* The court reasoned that the state proceedings against Mr. Nosirov had not "established criminal culpability," and that "[e]xtending *Demore* from convictions to unresolved accusations would expand the constitutional logic of mandatory detention beyond the setting the Supreme Court actually addressed" in *Demore*. *Id.* at *7.

Citing precedent that has "repeatedly emphasize[d] that civil immigration detention must remain tied to its justification and accompanied by constitutionally sufficient process," the *Nosirov* court then applied the *Mathews* factors to assess the adequacy of the process afforded to the petitioner. *Id.* (citing *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 231–35 (3d Cir. 2011), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018); *Chavez-Alvarez v. Warden York*

---

respondents had provided only a complaint-summons, not "an arrest warrant, booking record, or other custodial arrest document." *Id.* at *5. However, the court observed that the complaint-summons was "likely sufficient to show that the [p]etitioner was charged within the meaning of the [LRA]," and thus went on to reach his due process claims. *Id.*

*Cnty. Prison*, 783 F.3d 469, 474–78 (3d Cir. 2015); *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 210–14 (3d Cir. 2020); *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 12 F.4th 321, 329–31 (3d Cir. 2021)); *see also Hernandez-Lara v. Lyons*, 10 F.4th 19, 27–28 (1st Cir. 2021); *Black*, 103 F.4th at 147–48. The court concluded that all three factors favored the petitioner. First, the court characterized Mr. Nosirov's liberty interest as "obvious," rejecting the respondents' claim that his detention was constitutionally permissible merely because it had not yet become prolonged. *Nosirov*, 2026 WL 916602, at *7–*8. In reasoning instructive in considering Ms. Wright's Petition, the court found that the duration of Mr. Nosirov's detention did not bear on the core question at issue: "whether the government may impose mandatory detention without a bond hearing based solely on an unresolved criminal accusation." *Id.* at *8. As to the risk of erroneous deprivation, the court determined that such risk was "substantial because"—as with Ms. Wright— "the asserted trigger [was] not a conviction but an unresolved and disputed accusation." *Id.* at *7. Additional process "would permit a neutral decisionmaker to determine whether continued detention is actually necessary to address danger or flight risk." *Id.* Finally, the court acknowledged the legitimacy of the government's interest in ensuring the petitioner appeared in court and in protecting the community, but noted that the respondents did not "explain why those interests require[d] dispending with a bond hearing altogether." *Id.*

Ultimately, concluding that the petitioner's detention under the respondents' "no-bond theory" was unlawful, the court ordered that Mr. Nosirov be immediately released from ICE custody. *Id.* at *8.

**ii.** **The *Juan C.R.R.* court ordered the release of a petitioner who had previously been released on conditions pursuant to federal criminal charges, applying *Mathews* to find that his detention on the basis of unproven charges violated his procedural due process rights.**

In *Juan C.R.R.*, a case arising in the District of Minnesota, the petitioner had been indicted for two counts of assault on a federal officer with a dangerous weapon. 2026 WL 1045254, at *2. In connection with his federal criminal proceedings, he was released on conditions, including pretrial supervision. *Id.* ICE immediately detained him following his release from criminal custody. *See id.*

Although the magistrate judge who reviewed Mr. C.R.R.'s petition determined that his civil inadmissibility charge, as well as his pending federal criminal charges, brought him within the scope of the LRA, she nonetheless concluded that his continued detention without a bond hearing violated his right to procedural due process. *See id.* at *3–*4. Applying *Mathews*, the magistrate judge first found that Mr. C.R.R.'s liberty was abridged, noting that he had entered the United States with parole and subsequently established a life in Minnesota with his wife and children, who relied on him. *Id.* at *5. The court found the risk of erroneous deprivation "especially high," observing that Mr. C.R.R., like Ms. Wright, had not been convicted of any crime and that the court "must operate under the presumption that a defendant is innocent until proven guilty." *Id.* (citing *Coffin v. United States*, 156 U.S. 432 (1895)). The court additionally noted that the District of Minnesota had "witnessed an unprecedented pattern of criminal charges under the" statute with which Mr. C.R.R. had been charged, and that many of those cases had resulted in dismissals. *Id.* Finally, the court acknowledged the government's interest in protecting the community and preventing flight, but noted that the court had "previously assessed the same factors in ordering [the petitioner's] release on conditions . . . ." *Id.* *at 6. The court concluded that the petitioner's

"continued detention without a bond hearing, based solely on the unproven criminal charges against him, violate[d] his right to procedural process under the Fifth Amendment." *Id.* at *7.

The district court judge who reviewed the magistrate's decision adopted her report and recommendation with modification, noting that he shared the magistrate's "concern for [the Department of Homeland Security's] use of unchecked, extensive detention authority based solely on a noncitizen's criminal charges." *C.R.R.*, No. 2026 WL 752462, at *3. The district court departed from the magistrate only in the remedy ordered: while the magistrate had recommended that Mr. C.R.R. receive a bond hearing, the district court ordered immediate release. *Id.* The court noted that a bond hearing "was not necessary because [the petitioner had] already had a bond hearing based on his criminal charges," and, at that hearing, it had been determined that "he was neither a flight risk nor danger to the community." *Id.* As the respondents had not shown that the petitioner's circumstances had changed since the magistrate judge reached that conclusion, the district court judge saw fit to order release. *Id.* at *4.

### iii. In *Alcantara Guerrero*, the court found that mandatory detention on the basis of pending charges violated the petitioner's due process rights.

At the time ICE detained Mr. Alcantara Guerrero, whose case arose in the District of Massachusetts, he had recently been arrested for and charged with assault and battery on a police officer in violation of Mass. Gen. Laws. ch. 265, § 13D. *See Alcantara Guerrero*, 2026 WL 931503, at *2. The respondents contended that Mr. Alcantara Guerrero was detained under § 1226(c)(1)(E), which provides for mandatory detention of individuals charged with any "assault of a law enforcement officer offense." *Id.* at *3 (quoting 8 U.S.C. § 1226(c)(1)(E)(ii)). The court assumed, without deciding, that Mr. Alcantara Guerrero's pending charge qualified as a statutory predicate under the LRA, and proceeded to consider whether mandatory detention under the LRA infringed upon his procedural due process rights. *See id.*

8

In reasoning this Court should consider persuasive, the *Alcantara Guerrero* court dispensed with the respondents' argument, premised on *Demore*, that the court "should consider only whether [the petitioner's] detention [was] unreasonably prolonged," distinguishing Mr. Alcantara Guerrero's circumstances from those of the petitioner in *Demore*. 2026 WL 931503, at *3–*4. The court noted that, in *Demore*, the Supreme Court "looked in particular to Congress's findings that allowing discretionary release of noncitizens with criminal convictions 'pending their removal hearings would lead to large numbers . . . skipping their hearings and remaining at large in the United States unlawfully.'" *Id.* at *4 (quoting *Demore*, 538 U.S. at 528). Unlike the petitioner in *Demore*, the court reasoned, Mr. Alcantara Guerrero had "merely been arrested for, and charged with, assault and battery on a police officer"—like Ms. Wright, he had "not been convicted of the offense beyond a reasonable doubt, nor ha[d] he received 'the full procedural protections' of the criminal justice system, including a trial by a jury of his peers." *Id.* (quoting *Demore*, 538 U.S. at 513). Consequently, Mr. Alcantara Guerrero was "not in the same 'class of noncitizens who ha[ve] already been convicted (beyond a reasonable doubt) of committing certain serious crimes' for whom the Supreme Court found mandatory detention to be constitutionally permissible [in *Demore*]." *Id.* (quoting *Hernandez-Lara*, 10 F.4th at 35). The court also noted that, "unlike the portion of [s]ection 1226(c) considered in *Demore*, the [LRA] does not contain comparable legislative findings to support the proposition that people arrested for or charged with—though not convicted of—any of the listed offenses poses a heightened danger to the community or flight risk." *Id.* (citing *Doe*, 800 F. Supp. 3d at 216–17); *see also* Point II, *infra*.

Having found that *Demore* did not stand for the proposition that Mr. Alcantara Guerrero could be subject to mandatory detention without any process at all, the court then considered whether application of the LRA to him comported with due process, applying the *Mathews*

9

framework. As to the petitioner's liberty interest, the court noted that he had been detained "alongside criminal inmates" for nearly three months, "unable to work" and "an hour away from his family and home." *Id.* The court then found the risk of erroneous deprivation of the petitioner's liberty to be high because, like Ms. Wright, he was "being detained solely on the basis of an arrest and charge for which he is presumed innocent." *Id.* at *5 (citing *Doe*, 800 F. Supp. 3d at 216–17). The court highlighted that Mr. Alcantara Guerrero had not been "afforded the opportunity to contest the charge," nor had the respondents been "required to prove that he poses a flight risk or is a danger to the community." *Id.* ("Without any congressional findings that noncitizens like Alcantara Guerrero pose a heightened risk of flight risk or danger, the respondents are relying solely on the fact that he has been charged with an offense to keep him detained."). Finally, as to the government's interest, the court noted that the government's legitimate interest in ensuring the petitioner appeared for his removal proceedings would be protected by affording him a bond hearing. *Id.* at *5.[2] The court also observed that it was unclear why this governmental interest should take precedence over the other *Mathews* factors when a noncitizen is neither a danger or flight risk, and that "there are societal benefits" to limiting detention only to noncitizens who pose such risks. *Id.* at *5; *see also Hernandez-Lara*, 10 F.4th at 33 (observing that cabining detention in this manner "may save the government, and therefore the public, from expending substantial resources on needless detention," and, further, that "unnecessary detention imposes substantial societal costs").

---

[2] Although the petitioner in *Alcantara Guerrero* sought immediate release or, in the alternative, a bond hearing, the court did not discuss the possibility of immediate release in its decision. *See id.* at *1, *5.

Ultimately, the court found that the *Mathews* factors weighed in Mr. Alcantara Guerrero's favor and granted his writ for a petition for a writ of habeas corpus. 2026 WL 931503, at *5–*6.[3]

### iv. In *Doe*, a district court found that detention of a petitioner under the LRA on the basis of an unresolved arrest violated his due process rights.

In *Doe*, also a District of Massachusetts case, the petitioner had been arrested for "shoplifting by concealing merchandise." *Doe*, 800 F. Supp. 3d at 207. Some evidence in the record indicated that the arrest had been dismissed, and the parties agreed that there were no charges pending against the petitioner. *Id.* at 207 n.4. The respondents nonetheless argued that the petitioner's detention was mandatory because he had been "arrested for" shoplifting. *Id.* at 212.[4] As relevant here, the petitioner challenged his detention on due process grounds.

---

[3] Specifically, the court ordered that Mr. Alcantara Guerrero be released if not provided with a bond hearing consistent with the requirements set forth in *Hernandez-Lara* within a week. *See id.* at *6. In *Hernandez-Lara*, the United States Court of Appeals for the First Circuit held that, to detain a petitioner under 8 U.S.C. § 1226(a), "due process requires the government to either (1) prove by clear and convincing evidence that [they] pose[] a danger to the community or (2) prove by a preponderance of the evidence that [they] pose[] a flight risk." 10 F.4th at 41.

[4] The *Doe* court did not appear to consider whether the petitioner's arrest fell outside the scope of 8 U.S.C. § 1226(c)(1)(E) because his arrest had been dismissed. *See generally id.* at 211–12. A number of district courts have found that dismissed arrests or charges do not fall within the scope of the LRA, either because the provision's plain language only reaches pending arrests or charges, or because application of the canon of constitutional avoidance proscribes reading the statute so expansively as to cover dismissed charges. *See, e.g.*, *Rueda Torres v. Francis*, No. 25 Civ. 8408 (DEH), 2025 WL 3168759, at *5 (Nov. 13, 2025) (finding that § 1226(c)(1)(E) "does not provide for mandatory detention where, as here, the charges have been dropped"); *Sidqui v. Almodovar*, --- F. Supp. 3d ---, No. 25-CV-9349 (VSB), 2026 WL 251929, at *12 (S.D.N.Y. Jan. 30, 2026) (same); *Brandon Y. M. v. Andrews*, No. 1:25-CV-01962-SKO (HC), 2026 WL 125234, at *3 (E.D. Cal. Jan. 16, 2026) (finding that applying the LRA to an arrest for which a criminal complaint was never filed would pose "serious constitutional concerns" and therefore holding that the LRA was inapplicable to the petitioner); *E.C. v. Noem*, No. 2:25-CV-01789-RFB-BNW, 2025 WL 2916264, at *11 (D. Nev. Oct. 14, 2025) (applying the doctrine of constitutional avoidance to hold that the LRA's "reference to a person who 'is charged with' or 'is arrested' for a theft-related offense, in the present tense, cannot be read to apply to a person [who] has previously been arrested for and charged with a crime where they have been acquitted"); *Helbrum v. Williams Olson*, No. 4:25-CV-00349-SHL-SBJ, 2025 WL 2840273, at *1 (S.D. Iowa Sept. 30, 2025) (finding that, "[a]fter

Like the courts in *Nosirov* and *Alcantara Guerrero*, the *Doe* court distinguished *Demore* because it considered "the [d]ue [p]rocess rights of individuals 'whose convictions were obtained following the full procedural protections our criminal justice system offers.'" 800 F. Supp. 3d at 215–16. By contrast, the petitioner, much like Ms. Wright, had not received "any process as to his arrest and detention." *Id.* at 216. Additionally, as in *Alcantara Guerrero*, the *Doe* court noted that the Supreme Court in *Demore* "underscored the legislative findings supporting [s]ection 1226(c)—prior to the [LRA's] amendments to that section—of the need to detain 'deportable criminal aliens' based on statistics suggesting their likelihood of not appearing for removal hearings and their likelihood of subsequent arrests before deportation proceedings began." *Id.* at 215; *see also* Section II, *infra*. The respondents in *Doe* did not dispute that Congress, in enacting the LRA, made no findings that merely being arrested for shoplifting correlated to flight risk or dangerousness in any way. 800 F. Supp. 3d at 216.

The *Doe* court proceeded to apply the *Mathews* factors to the petitioner's circumstances. With respect to the private liberty interest affected, the court cited the petitioner's interest in being free from detention and the anticipated duration of detention, given the typical length of removal proceedings and appeals. *Id.* As to the risk of erroneous deprivation, the court found that risk to be high because the petitioner's detention "was based on arrest for which no charges ha[d] been filed," and further found that the underlying alleged conduct—shoplifting, the same conduct Ms. Wright is alleged to have engaged in—bore "no relationship to dangerousness or flight risk." *Id.* at 216–17. Finally, in discussing the government's interest, the court noted that the government, as it had in *Nosirov*, failed to explain why its interest in ensuring a petitioner appear for removal

_____

charges are dismissed, it is no longer accurate to say that a person 'is charged with' theft (present tense)").

proceedings should hold sway when the petitioner was not a flight risk. *Id.* at 217. The court

concluded that "the public has no interest in the detention without bond of someone against whom

no criminal charges are pending and who is an active member in his community." *Id.*

The *Doe* court therefore found that the petitioner's mandatory detention under the LRA

violated his due process rights, and ordered that he receive a bond hearing. *Id.*[5]

> **B.      At least three district courts have applied the *Mathews* factors to petitioners detained pursuant to the LRA under circumstances distinct from those of Ms. Wright, bolstering the conclusion that this framework should be used to determine the process due to a petitioner held under the statute.**

> **i.      At least two district courts have found the LRA unconstitutional as applied to petitioners whose criminal charges had been dismissed or otherwise favorably resolved.**

*S.E.* (Eastern District of California) and *Vega* (Western District of Missouri) highlight the

tremendous risk of erroneous deprivation of a petitioner's liberty when their criminal cases

resolved without a conviction. In *S.E.*, the respondents claimed that the petitioner was subject to

mandatory detention under 8 U.S.C. § 1226(c)(1)(E) because he had been arrested for battery with

serious bodily injury, even though the South San Francisco Police Department had investigated

the matter and declined to prosecute it. 2026 WL 206085, at *1–*2. The petitioner contended that

application of the LRA to him under these circumstances violated his due process rights. *Id.* at *2.

Applying *Mathews*, the *S.E.* court agreed, citing, in particular, the high risk of the erroneous

deprivation of the petitioner's liberty where he could "not be provided process through the criminal

system to contest the basis for his arrest, because prosecution was rejected, charges have not been

---

[5] Because, like *Alcantara Guerrero*, *Doe* arose in the First Circuit, the government would bear the burden to establish danger and flight risk at any such bond hearing, regardless of the length of detention. *See Hernandez-Lara*, 10 F.4th at 41. It is unclear whether the petitioner sought immediate release in his petition; the *Doe* decision does not discuss this potential remedy at all. *See* 800 F. Supp. 3d at 217.

filed and the investigation of the incident in question has been closed." *Id.* at *2–*4. The court therefore ordered that the petitioner receive a bond hearing at which the respondents bore the burden of establishing danger and flight risk by clear and convincing evidence. *Id.* at *4.

Similarly, in *Vega*, the respondents claimed that the petitioner was subject to mandatory detention under the LRA because she was charged with aggravated battery, notwithstanding the fact that the charges had been dismissed. *Vega*, 2026 WL 482906, at *5, *5 n.3. Relying heavily on the reasoning in *Doe*, the court applied the *Mathews* framework to assess the adequacy of the process that had been provided to the petitioner. *Id.* at *5–*6. The court highlighted that the risk of erroneous deprivation was especially high because the petitioner's detention was "based on arrest for which charges have been dismissed and the underlying conduct for which bears no relationship to dangerousness or flight risk." *Id.* at *6. The court therefore determined that detaining the petitioner without a bond hearing violated her due process rights, and ordered that she receive such a hearing. *See id.* at *6–*7.

> ii. **At least one district court has found application of the LRA unconstitutional as applied to a petitioner whose detention had become unreasonably prolonged.**

*Veletanga*, arising in the Southern District of New York, and *Singh v. Warden, Golden State Annex ICE Det. Facility*, No. 1:26-CV-00048 DJC SCR, 2026 WL 923808 (E.D. Cal. Apr. 6, 2026) (a magistrate judge's report pending review by a district court judge), reinforce the conclusion that *Mathews* is the appropriate test for determining the process due to a petitioner like Ms. Wright. In *Veletanga*, the respondents asserted that the petitioner was subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(E). 2025 WL 3751865, at *5. The basis for this claim is not entirely clear: although the petitioner had been arrested several times and had a misdemeanor conviction, the status of the various arrests is not elucidated in the opinion, and the specific

conviction or charge that rendered him subject to the LRA is not named. *See id.* at *1, *5. In any event, the court, following *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020), and *Black*, 103 F. 4th at 138, applied the *Mathews* framework to assess whether the petitioner's detention was constitutionally permissible. *Id.* at *5. Citing, among other considerations, the petitioner's decades of residence in the United States and the absence of any procedural protections afforded to him to date, the court concluded that, "[w]hether analyzed under §§ 1226(a) or (c)," the petitioner's "prolonged detention" of over three months "without a bond hearing is unreasonable and a violation of due process." *Id.* at *4–*7. The court went on to order that the petitioner receive an individualized hearing at which the government had to establish flight risk and danger by clear and convincing evidence, and at which alternatives to detention were considered as to both factors. *Id.* at *7.

Additionally, although a district court has not yet ruled on the matter, in *Singh*, a magistrate judge in the Eastern District of California determined that the petitioner, who had been detained for seven months, was subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(E) because he was inadmissible under § 1182(a)(6)(A)(i) and had a pending robbery charge under Cal. Penal Code § 211. 2026 WL 923808, at *2– *3. Applying the *Mathews* factors, with particular attention to the lengthy duration of the petitioner's detention, the court concluded that the petitioner was entitled to a bond hearing and recommended that the petition be granted. *Id.* at *6–*7.

**C.**     **At least two district courts, resting on flawed, perfunctory analyses of _Demore_, have found that applying the LRA to a petitioner with criminal charges pending at the time of their detention by ICE does not pose a constitutional problem.**

   **i.**     ___Cardoso___ **relied on inapposite authority to erroneously hold that detention under the LRA while facing pending criminal charges was constitutionally permissible.**

In _Cardoso_, a case arising in the District of New Mexico, the petitioner had been charged with Florida grand theft. _See_ 2026 WL 194626, at *1. She contended, as relevant here, that detaining her in New Mexico while she faced criminal charges in Florida violated her procedural and substantive due process rights. _Id._ at *5. The court rejected that argument, asserting that "the fact that a detainee is simultaneously defending criminal charges does not confer an independent right to release from civil immigration detention or require additional process beyond that that provided by statute." _Id._ at *6. In support of this conclusion, the court relied chiefly on a Tenth Circuit case that considered an appeal of a district court's denial of a federal prisoner's request for an immediate determination as to whether any revoked supervised release time should run concurrently with his state prison sentence. _See id._ (citing _United States v. Romero_, 511 F.3d 1281, 1284 (10th Cir. 2008)). _Romero_ does not address the rights of noncitizens subject to mandatory detention at all, and it is unclear why the court considered it dispositive in assessing the process due to a detained noncitizen facing criminal charges.

Additionally, in analysis eliding the significant expansion of the immigration detention authority effected by the LRA, the _Cardoso_ court noted that the petitioner could have sought a hearing pursuant to _Matter of Joseph_, 22 I. & N. Dec. 799, 800 (BIA 1999), to contest whether the statutory basis for her detention in fact applied to her, and further asserted that the Fifth Amendment did not require any process beyond such a hearing. _Id._ (citing _Demore_, 538 U.S. at 523–31, and _Jennings_, 583 U.S. at 306). In this portion of its decision, the court relegated _Demore_

16

to a single citation, and thus—unlike the courts in *Nosirov*, *Alcantara Guerrero*, and *Doe*—failed to afford meaningful consideration to the distinctions between the facial challenge to the pre-LRA § 1226(c) at issue in *Demore* and an as-applied challenge to mandatory detention on the basis of pending criminal charges under the LRA. *See id.* The court additionally misread *Jennings*, claiming that the case rejected "the conclusion that the government is required to supply procedural protections beyond those imposed by statute or regulation," thereby sidestepping the fact that *Jennings* did not reach any constitutional arguments pertaining § 1226(c) on the merits. *Id.*; *see also Jennings*, 538 U.S. at 312.

In sum, *Cardoso*—a decision that gravely misreads *Demore* and *Jennings*—should not dissuade this court from concluding that *Demore* does not control Ms. Wright's case, which arises based on changes to § 1226(c) made just last year.

### ii. *Calderon* similarly failed to recognize the material expansion of the government's detention authority wrought by the LRA.

In *Calderon*, a case in the Western District of Washington, the petitioner had been charged with grand theft of personal property in violation of Cal. Penal Code § 487(a) at the time of his arrest by ICE. *See* 2025 WL 3754042, at *2. Although the criminal case was dismissed while he was detained, the court determined that "the threshold question" before it was "whether due process required [the respondents] to provide Mr. Calderon with a pre-deprivation hearing" at the time of his detention, "when it is undisputed that the LRA applied to him." *Id.* at *4. Applying the *Mathews* factors, the court concluded that no such process was due. *See id.* at *7–*8. In particular, the court highlighted that the petitioner had failed "to distinguish his arguments and the facts of his case from *Demore*," "the immediate availability of a *Joseph* hearing to determine whether the LRA actually did apply," and "the availability of a bond hearing at such time as detention has become unreasonable." *Id.* at *8. As to the first factor, although the court acknowledged that

*Demore* and *Jennings* addressed § 1226(c) only "as the statute existed prior to its amendment through the LRA," it appears the petitioner did not press the significant expansion of the government's civil detention authority made possible by the statute. *Id.* at *5. Indeed, the court noted that the petitioner had not "raise[d] a constitutional challenge to the LRA." *Id.* at *8. Consequently, the court held "that the lack of a pre-detention hearing did not violate Mr. Calderon's procedural due process rights." *Id.*

Unlike in *Calderon*, the record before this Court demonstrates that Ms. Wright's circumstances are wholly distinguishable from those of the petitioner in *Demore*. Respondents purport to subject Ms. Wright to a detention authority created by Congress more than two decades after *Demore* was decided. Further, unlike the petitioner in *Demore*, Ms. Wright does not have any criminal convictions. Consequently, the Court should not regard *Calderon* as persuasive, and should instead consider the reasoned analyses of *Nosirov*, *Juan C.R.R.*, *Alcantara Guerrero*, and *Doe* in deciding Ms. Wright's claims.

**II.  While the Supreme Court in *Demore* authorized mandatory detention under the pre-LRA version of section 1226(c) based largely on congressional findings regarding the flight risk and danger posed by noncitizens with criminal convictions, the legislative history of the LRA does not contain any comparable findings regarding people with pending criminal charges.**

Unlike in *Demore*, the legislative history of the LRA does not indicate that Congress considered any studies or statistics pertaining to the flight risk or danger posed by noncitizens with pending criminal cases. This sparse congressional record weighs heavily in favor of rejecting the Respondents' argument that *Demore* forecloses Ms. Wright's as-applied challenge to her mandatory detention under the LRA. *See* Resp'ts' Opp. 6. Moreover, the paucity of legislative findings as to any risks posed by noncitizens with pending criminal cases underscores the exceptionally high probability of erroneously depriving Ms. Wright of her liberty: Respondents

wish to subject her to mandatory detention on the basis of recently-passed legislation wholly unsupported by any studies that might suggest she poses a flight risk or danger. *See generally* Section IV.B., *infra.*

> **A.** **The Supreme Court's decision in *Demore* rested on a robust congressional record, including studies supported by statistical findings, indicating that noncitizens with certain criminal convictions posed a danger or flight risk.**

In *Demore*, the Supreme Court relied heavily on the congressional record underpinning the pre-LRA version of § 1226(c) to reject a facial challenge to the statute. *See* 538 U.S. at 528. The Court reasoned that, "in adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of [noncitizens] pending their removal proceedings would lead to large numbers of deportable criminal [noncitizens] skipping their hearings and remaining at large in the United States unlawfully." *Id.* In the Court's view, this evidence "certainly support[ed] the approach [Congress] selected"—that is, subjecting noncitizens with certain criminal convictions to mandatory detention. *Id.* The Court therefore determined that "[d]etention during removal proceedings is a constitutionally permissible part of that process." *Id.* at 531.

The Court's discussion of the legislative history underpinning the pre-LRA version of § 1226(c) reveals an extremely well-developed congressional record. The Court cites to multiple sources, including subcommittee reports, House and Senate reports, and congressional hearings. *See id.* at 518–19; *see also* S. Rep. No. 104–48, at 1 (1995); S. Rep. No. 104–249, at 7 (1996); H.R. Rep. No. 104–469, at 123 (1995); Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993); Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989).

Based on that record, the Court in *Demore* cites to specific statistical evidence to bolster its conclusion that mandatory detention under § 1226(c) without an initial bond determination was constitutionally permissible. The Court considered, for example, a 1986 study that found that, after noncitizens with criminal convictions were identified as deportable, "77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began." *Demore*, 538 U.S. at 518 (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)). The Court additionally cited evidence that "more than 20% of deportable criminal [noncitizens] failed to appear for their removal hearings." *Id.* at 519 (citing S. Rep. 104–48, at 2); *see also id.* at 520 (examining study by the Vera Institute of Justice discussed in the dissent that found that 77% of deportable noncitizens with criminal convictions attended their removal proceedings, a figure the majority considered "even more striking than the one-in-five flight rate reflected in the evidence before Congress when it adopted § 1226(c)"). These data figured heavily into the Court's decision in *Demore*: according to the Court, the Vera Institute of Justice study, in particular, "strongly support[ed] Congress's concern that, even with individualized screening, releasing deportable criminal [noncitizens] on bond would lead to an unacceptable rate of flight." *Id.* at 520.

In sum, in *Demore*, the Supreme Court relied on an expansive congressional record to hold that mandatory detention under the pre-LRA version of § 1226(c) is constitutionally permissible even without an initial bond determination.

**B.** **By contrast, prior to passing the Laken Riley Act in 2025, Congress did not appear to have considered any statistical evidence or made any specific findings as to danger or flight risk posed by noncitizens charged with, but not convicted of, certain crimes.**

In enacting the LRA, Congress did not make any specific findings that merely being arrested for or charged with the offenses enumerated in the statute correlated with flight risk or danger in any way. In stark contrast to the record at issue in *Demore*, it appears that the only report produced by Congress in connection with the LRA was an eight-page interim report prepared by staff of the House Judiciary Committee, which contained no data at all regarding the danger or flight risk posed by noncitizens with open criminal cases. *See* Staff of H. Comm. on the Judiciary & Subcomm. on Immigration Integrity, Security, & Enf't, The Consequences of the Biden-Harris Administration's Open-Borders Policies: The Case of the Illegal Alien Who Killed Laken Riley (Comm. Print Aug. 16, 2024).[6] The report asserts, without citing any empirical data, that "illegal aliens commit[] crimes against Americans at an alarming rate," and highlights facts from the file of Jose Ibarra, the assailant in Laken Riley's case. *Id.* at 4–8. Additionally, the report references requests for files related to "dozens of illegal aliens who have committed violent and serious crimes during the Biden-Harris Administration," *id.* at 5, but those files do not appear in the congressional record. Further, the reference to "dozens" of cases suggests a reliance on isolated, tragic cases, rather than any aggregated trends or statistics. *See id.*

Indeed, empirical data is largely absent from the rest of the congressional record, with the exception of data proffered by the LRA's opponents. In a House Judiciary Committee hearing on January 22, 2025, for example, Rep. Jasmin Crockett entered into the record a study showing that

---

[6] *Available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/08-16-2024-The-Case-of-the-Illegal-Alien-Who-Murdered-Laken-Riley.pdf.

undocumented immigrants commit crimes at rates lower than U.S.-born citizens. *See* Restoring Immigration Enforcement in America, Subcomm. on Immigr. Integrity, Sec., and Enf't, Hearing before the H. Comm. on the Judiciary, 118th Cong. 86 (Jan 22, 2025)[7] (citing *Undocumented Immigrant Offending Rate Lower than U.S.-Born Citizen Rate*, Nat'l Inst. of Justice (Sept. 12, 2024))[8] [hereinafter Judiciary Comm. Report]; *see also, e.g.*, *id.* at 36 (setting forth data from the Cato Institute showing that immigrants are much less likely to commit and be incarcerated for serious crimes). Although proponents of the LRA disputed those statistics, they did not offer any concrete data to support their objections. *See id.* at 97 (in testimony from Rep. Derek Schmidt, urging, without evidence, that his peers "[t]hink of the volume that we're talking about here and how offensive it is to . . . victims and families to say statistically illegal aliens don't kill people at a higher rate than anybody who actually lives here"); *id.* at 80 (in testimony from Rep. Barry Moore, stating that a guest from the Cato Institute had "given . . . a lot of statistics today," but "the reality [was] that 76 million people elected Donald Trump to fix the chaos that is at the U.S. Southern border right now," and rejecting the data presented as "[l]ies, dang lies, and statistics").

In sum, the legislative history of the LRA indicates that Congress did not rely on any empirical data or studies in choosing to subject noncitizens accused of certain crimes to mandatory detention, or otherwise make any specific findings, grounded in statistical evidence, as to the danger or flight risk posed by such noncitizens. Instead, the bill's supporters relied largely on anecdotal accounts of tragic, but seemingly isolated, incidents. *See, e.g.*, Judiciary Comm. Report

---

[7] *Available at* https://www.congress.gov/119/chrg/CHRG-119hhrg58430/CHRG-119hhrg58430.pdf.

[8] *Available at* https://docs.house.gov/meetings/JU/JU01/20250122/117827/HHRG-119-JU01-20250122-SD004.pdf.

73, 80, 96–97 (in testimony of various supporters of the LRA, referencing specific violent offenses allegedly carried out by noncitizens, rather than any aggregated data).

**III.     Mandatory detention under 8 U.S.C. § 1226(c)(1)(E) would gravely impede Ms. Wright's ability to defend herself against the unproven criminal allegations that ICE uses to justify her detention.**

ICE detention can render it nearly impossible for criminal defendants to vindicate their constitutional rights in criminal court. Ms. Wright, specifically, would face particularized challenges in defending herself against the unproven allegations against her were she to be detained under the LRA. Respondents indicated that she would be detained at a great distance from the Nassau County District Court, and numerous sources indicate that ICE routinely fails to honor state court writs attempting to arrange for people detained by ICE to be produced in criminal court.

**A.     As a general matter, ICE detention undermines the ability of criminal defendants to vindicate their constitutional rights in criminal court.**

Before discussing the specific challenges faced by noncitizens accused of crimes in Nassau County and subsequently detained by ICE, the Petitioner notes that numerous sources, including caselaw and academic research, have detailed the immense difficulties faced by individuals detained by ICE in attempting to resolve pending criminal proceedings. These challenges can ultimately prevent noncitizens from obtaining criminal defense counsel, compromise their right to a speedy trial, and deprive them of their right to access the courts. *See* Tiffany J. Lieu, *The Accountability Deficit: When Immigration Detention Obstructs One's Day in Criminal Court*, 125 Colum. L. Rev. 1631, 1655–71 (2025).

Specifically, ICE may refuse to transport a noncitizen to court or otherwise impose barriers that prevent local law enforcement from transporting the noncitizen instead. *See id.* at 1648–54. First, "[i]n some cases, ICE affirmatively prevents an individual from accessing criminal court proceedings by refusing to physically transport the individual to court and, moreover, refusing to

permit anyone else to transport the individual." *Id.* at 1649 (describing a series of instances in 2017 in which ICE refused to honor state court writs seeking to produce noncitizens detained at the Plymouth County Correctional Facility in criminal court). Seemingly more common, however, are situations in which ICE "policies and practices may effectively obstruct court access." *Id.* at 1649– 50. In such cases, although ICE does not explicitly refuse to release a noncitizen into the custody of local law enforcement, "practical barriers—many of which ICE itself manufactures—prevent local officials from being able to fill the transportation gap." *Id.* at 1650.

Perhaps the most common of these barriers "is ICE's practice of transferring noncitizens to detention facilities far from criminal court proceedings and often across case lines." *Id.* In such cases, local law enforcement may be unable or unwilling to travel a great distance, particularly to an out-of-state jurisdiction. *See id.* at 1651–52 (describing the experience of "Martinez," who, after being transferred from Massachusetts to Moshannon Valley Processing Center, or "MVPC," in Pennsylvania, was only able to appear for trial—where he was acquitted—nine months after his original trial date after filing a federal writ of habeas corpus ad testificandum).

Further, "ICE often refuses to produce an individual to criminal proceedings virtually." *Id.* at 1652. MVPC, where Respondents indicated at argument that they would have sent Ms. Wright, again exemplifies this roadblock: at the facility, this "refusal is a matter of policy, the constitutionality of which is currently being challenged in federal district court." *Id.*; *see also id.* at 1653 (quoting email from ICE to the administrator for Union City Municipal Court stating that "[t]he facility does not have the staff or resources for virtual hearings at all"); *Doe v. U.S. Dep't of Homeland Security*, No. CV 3:24-259, 2025 WL 360534, at *1 (W.D. Pa. Jan. 31, 2025), *opinion clarified*, No. CV 3:24-259, 2025 WL 949846 (W.D. Pa. Mar. 28, 2025) (describing civil rights action arguing that MVPC's policy and practice of preventing detained individuals from accessing

New Jersey state court proceedings via videoconference technology was unlawful). In *Doe*, the plaintiffs sought a preliminary injunction requiring MVPC to honor writs for in-person proceedings and virtually produce individuals via videoconference for New Jersey criminal court appearances, among other requirements. *See id.* at *1, *3. In granting the preliminary injunction, the court "found a causal connection between ICE/[MVPC]'s action in detaining the charged individual and assuming custody, [MVPC]'s refusing remote court attendance, and the resultant deprivations attributable to [MVPC]'s denial of access to attend hearings remotely at the detention center." *Id.* at *6.

The overwhelming hurdles faced in accessing criminal courts at issue in *Doe* are not isolated: numerous other court decisions, as well as practitioner accounts, recount similar difficulties. ICE declined to produce the petitioner in *Velasco Lopez* in criminal court, for example, "on four separate occasions from February 2018 to April 2018," and he "faced similar obstacles in attempting to resolve the charges stemming from" a separate arrest. 978 F.3d at 847. The criminal court issued a bench warrant in connection with his failure to appear, even though he was in ICE custody at the time and his failure to appear was not willful. *Id.* Other habeas petitions describe similar difficulties in accessing criminal courts while in ICE custody. *See, e.g.*, *Linares Martinez v. Decker*, No. 18-CV-6527 (JMF), 2018 WL 5023946, at *1 (S.D.N.Y. Oct. 17, 2018) (noting that, "as a result of his immigration detention, [the petitioner] missed three criminal court dates and has been unable to meet or speak with his court-appointed defense attorney"); *Jorge S. v. Sec'y of Homeland Sec.*, 18-CV-1842 (SRN/HB), 2018 WL 6332717, at *3 (D. Minn. Nov. 15, 2018) (enumerating difficulties in accessing criminal defense counsel after ICE detained the petitioner 300 miles from the location of his criminal proceedings). Staff at The Bronx Defenders report similar barriers. *See, e.g.*, Ex. A, Karla Ostolaza Ortiz Decl. ¶ 5 (in declaration from the

Managing Director of The Bronx Defenders' Immigration Practice, stating that, in her over a decade of experience, "it is rare that a client is produced in criminal court from ICE custody") [hereinafter Ostolaza Decl.]; *id.* ¶ 7 (recounting the experience of J.M., for whom ICE has filed to honor multiple state court writs of habeas corpus ad prosequendum); *id.* ¶ 11 (describing the experience of D.D., who The Bronx Defenders sought to have produced in criminal court over the course of seven months without success). Additionally, if a noncitizen is detained by ICE after accepting a conditional plea that requires participation in treatment or other programming, their detention can prevent them from fulfilling the terms of their sentence or otherwise pursuing mitigation. *See, e.g., id.* ¶ 9 (relaying the experience of E.M., who was detained by ICE after accepting a conditional plea in criminal court and was thus unable to comply with his sentence— namely, participation in certain programming); *id.* ¶ 12 (describing the experience of G.C., who has been advised that the best way to resolve his open criminal case would be through pre-plea mitigation, but who is unable to participate in the requisite classes while detained by ICE).

When ICE stands in the way of a noncitizen who seeks to appear in criminal court, the agency jeopardizes the safeguards intended to protect criminal defendants under the Constitution. *See* Lieu, 125 Colum. L. Rev. at 1665. First, "obstruction of court access obstructs [noncitizens'] ability to obtain and maintain appointed public defense counsel." *Id.* at 1666 (describing how, in New Jersey, if an individual misses their first court appearance due to ICE detention, they also miss their opportunity to demonstrate eligibility for a public defender); *see also Doe*, 2025 WL 360534, at *5 n.6 (noting that the right to counsel "is one of many rights subverted when a detainee is denied an appearance in court"); *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). Additionally, because judges often adjourn criminal proceedings over months or years while a noncitizen is detained by ICE, "that delay may run afoul of the constitutional and statutory right to a speedy

trial." Lieu, 125 Colum. L. Rev. at 1668–69; *see also Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). More broadly, "when an individual is obstructed from court proceedings, that obstruction subverts the Supreme Court's recognition in *Bounds v. Smith* that it is 'established beyond doubt that [individuals] have a constitutional right of access to the courts.'" Lieu, 125 Colum. L. Rev. at 1670 (quoting 430 U.S. 817, 821 (1977)).

        **B.**       **ICE detention profoundly compromises the ability of noncitizens to defend themselves against unproven allegations in Nassau County courts, specifically.**

Having presented context regarding the impact of ICE detention on the ability of criminal defendants to vindicate their rights as a general matter, Petitioner now provides background information about how criminal proceedings similar to those of Ms. Wright's are generally initiated in Nassau County, and how ICE detention can affect those proceedings. As detailed in the declaration of Donna Zak, an Immigration Unit Supervisor for The Legal Aid Society of Nassau County ("LASNC"), N.Y. Crim. Pro. Law § 150.20 authorizes local police to serve an arrested individual with a desk appearance ticket ("DAT") directing them to appear in a given court at a designated time in the future, rather than immediately bringing them before the criminal court and promptly filing an accusatory interest. *See* Ex. B, Donna Zak Decl. ¶ 4 [hereinafter Zak Decl.]; *see also* N.Y. Crim. Pro. Law § 150.20(1)(a) (providing that an officer "shall" issue a DAT when a person is arrested for an offense than a class A, B, C, or D felony, or certain other enumerated offenses); *id.* § 150.20(1)(b) (setting forth a number of exceptions to the DAT issuance requirement, including when the person has outstanding criminal or superior court warrants or has failed to appear in court proceedings over the last two years). Typically, when an individual appears in criminal court pursuant to a DAT, "that person enters a plea of not guilty, bail status is determined and an indigency determination is made to determine if the arrestee qualifies for a public defender to assist them in their defense." Zak Decl. ¶ 7.

This order of operations—being issued a DAT, appearing for arraignment, entering a plea, receiving a bail determination, and receiving an indigency determination and possibly securing criminal defense counsel—can be entirely derailed by ICE detention. Since the Nassau County Police Department ("NCPD") entered into a cooperation agreement with ICE pursuant to 8 U.S.C. § 1357(g) (commonly referred to as a "287(g) agreement," referencing the relevant provision of the Immigration and Nationality Act) in March 2025, LASNC has observed that the NCPD now often issues DATs when authorized and, "as they deem appropriate, immediately transfer[s] the arrestee to ICE instead of releasing them." Zak Decl. ¶¶ 3, 5; *see also* Ex. C, NCPD-ICE 287(g) Agreement. Due to the ensuing ICE detention, the arrested individual will likely "then miss[] their DAT court date." Zak Decl. ¶ 6. Crucially, at the time a DAT is issued, an arrested individual has not yet been assigned an attorney and the criminal court has not yet had contact with them, and neither NCPD nor ICE "indicate to the parties involved in the court process that the arrestee has been transferred to ICE and/or detained." *Id.* Consequently, Nassau County courts often issue warrants for people in ICE custody who have missed their court dates, "and the cases are taken off the court calendar" through no fault of their own. *Id.*

Since the implementation of the NCPD-ICE 287(g) agreement last year, LASNC has endeavored to determine if defendants with DATs who miss their court dates are in ICE detention, but has encountered numerous logistical hurdles in doing so. *See id.* ¶ 8. If LASNC can locate a defendant in detention, they request "to be assigned in order to try to reach out to the client to see if they would like to appear for their arraignment virtually, pursuant to N.Y. Crim. Pro. Law § 182.20." *Id.*; *see also id.* ¶ 9 ("Many times, legal phone calls need to be set up weeks in advance, and by the time they come around, the detainee has been transferred or removed.").

LASNC further reports that, as a general matter, "ICE does not honor writs to Nassau County unless the client is detained close by, such as in [Metropolitan Detention Center] Brooklyn or Orange County Jail in Goshen, New York." *Id.* ¶ 11; *see also* N.Y. Crim. Pro. Law § 580.30(2) (setting forth procedure by which New York State courts issue writs of habeas corpus ad prosequendum). Even at these relatively close facilities, "writs . . . can take several attempts before possibly being successful, with each attempting requiring a separate approximately month-long adjournment of the case." Zak Decl. ¶ 11; *see also* Ostolaza Decl. ¶¶ 8, 10 (describing the experiences of John Doe and C.M., who have both missed criminal court appearances in Nassau County while in ICE custody, and who have been advised by LASNC that "it is not clear when or if the writ process will succeed").

In any event, "[b]ecause writs are not honored for the majority of arrestees held in immigration detention facilities throughout the country, virtual court hearings are the main way [LASNC] attempt[s] to provide some due process in these cases." Zak Decl. ¶ 12. However, under N.Y. Crim. Pro. Law § 182.20(1)(c), proceeding to trial virtually is not permitted. *Id.* Consequently, many noncitizens detained by ICE are effectively deprived of their right to a jury trial. *See* U.S. Const. amend VI; *see also* Zak Decl. ¶ 12 ("[T]he majority of these cases result in a plea."). Further, "due to limitations on what type of sentences one can receive while detained . . . by ICE, sometimes an agreed-upon resolution is unobtainable and, if the client is eventually removed from the United States, a warrant results." *Id.*

> **C. Mandatory ICE detention pursuant to 8 U.S.C. § 1226(c)(1)(E) would inhibit Ms. Wright's ability to defend herself against the unproven criminal allegations against her.**

According to Respondents' evidence, the NCPD issued Ms. Wright a DAT returnable to the Nassau Country First District Court on April 29, 2026. *See* ECF No. 10-1, at 1. Had Ms. Wright

remained detained by ICE without the possibility of seeking release, her ability to vindicate her constitutional rights and defend herself against unproven allegations would have been severely compromised.

First, Ms. Wright would likely have been unable to arrange to appear for arraignments or any subsequent criminal court appearance, whether virtually or in-person. At argument on April 15, 2026, Respondents' counsel indicated that, had the Court not ordered that Ms. Wright remain in the Southern District of New York, Eastern District of New York, or District of New Jersey, she likely would have been sent to MVPC. This report is consistent with the experience of staff at The Bronx Defenders, who report that, recently, their female clients have been detained at MVPC or South Louisiana ICE Processing Center. Ostolaza Decl. ¶ 4. Ms. Wright similarly recalls that, while she was detained at 26 Federal Plaza, ICE officers told her that her lawyer "had put a hold on [her] but the other women [with whom she was detained] could be moved and they were taking them to Louisiana." Ex. D, Sherika Wright Decl. ¶ 14 [hereinafter Wright Decl.].

Had Ms. Wright been sent to MVPC, the facility's poor track record of compliance with state court writs, whether for in-person or virtual appearances, suggests that she would not have been able to defend herself against the allegations against her. *See generally* Section III.A., *supra*. Practically speaking, the distance from Nassau County to MVPC, in Philipsburg, Pennsylvania, renders the possibility of appearing in-person impracticable. *See* Lieu, 125 Colum. L. Rev at 1651–52 (describing how "Martinez," who was detained by ICE at MVPC but faced criminal charges in Massachusetts, only succeeded in appearing for trial after filing a federal writ of habeas corpus ad prosequendum). Indeed, MVPC has failed to produce at least one client of The Bronx Defenders to criminal court even when their proceedings were pending in Harrisburg, Pennsylvania—a location much closer to MVPC than Nassau County. *See* Ostolaza Decl. ¶ 6 (describing the

experience of D.H., who was detained at a criminal court appearance in Harrisburg and missed her next appearance due to her ongoing ICE detention). As for virtual proceedings, MVPC routinely refuses to produce criminal defendants for court. See Lieu, 125 Colum. L. Rev at 1652; *see also Doe*, 2025 WL 360534, at *6. Crucially, although the *Doe* litigation won a preliminary injunction requiring ICE to produce class members for criminal court appearances, the injunction only applies to appearances in New Jersey state criminal matters. *See id.* at *1.

Moreover, had Ms. Wright been sent to Louisiana rather than MVPC, the practical difficulties of arranging for her transportation to court or otherwise facilitating her appearance would have been all the more heightened. In addition to the greater physical distance between Louisiana and Nassau County, practitioners report that ICE detention centers in Louisiana consistently fail to honor state court writs of habeas corpus ad prosequendum.

Further, regardless of whether she was detained at MVPC or in Louisiana, Ms. Wright would have run the risk of being issued a bench warrant. *See* Zak Decl. ¶ 6; Ostolaza Decl. ¶ 8 (describing the experience of J.M., who was issued a bench warrant by a Nassau County court after missing court due to ICE detention); *see also* Lieu, 125 Colum. L. Rev. at 1667–68 (noting that, "[e]ven if an individual is able to secure release from immigration detention, an outstanding bench warrant means that state law enforcement may apprehend and redetain them . . . through no fault of their own").

Finally, in the unlikely event that Ms. Wright could succeed in arranging virtual participation in her criminal proceedings, whether from MVPC or Louisiana, such virtual participation would have prevented her from vindicating her right to a jury trial had she wished to do so. *See* Zak Decl. ¶ 12; N.Y. Crim. Pro. Law § 182.20(1)(c). And had arranging virtual participation proven impossible, or had she wished to proceed to trial, Ms. Wright's only path to

meaningfully participating in her criminal proceedings would have been hoping that ICE eventually honored a state court writ or pursuing a federal writ of habeas corpus ad prosequendum. *See* Zak Decl. ¶ 11; Lieu, 125 Colum. L. Rev. at 1655–56 (observing that "[f]ederal writs of habeas corpus provide a more effective means of binding ICE, as a federal agency, to produce an individual in custody to state or federal court").

In sum, were Ms. Wright to be subject to detention under 8 U.S.C. § 1226(c)(1)(E) without the possibility of seeking release, it is exceptionally unlikely that she would have been able to avail herself of the constitutional safeguards intended to protect criminal defendants under the Constitution, including the right to a speedy trial and the right of access to the courts. *See* Lieu, 125 Colum. L. Rev. at 1668–70.

**IV.     All three *Mathews* factors weigh in favor of finding that subjecting Ms. Wright to mandatory detention on the basis of unproven criminal allegations without any pre-deprivation notice or process violates her procedural due process rights, and the appropriate remedy for that constitutional violation is immediate release.**

> **A.      The appalling conditions at 26 Federal Plaza, which caused Ms. Wright's mental health to decompensate, illustrate the importance of the liberty interest at stake when one is subject to ICE detention.**

The "most significant liberty interest there is—the interest in being free from imprisonment," *Velasco Lopez*, 978 F.3d at 851, may be heightened when a petitioner is detained in particularly poor conditions, even for a relatively short period of time. *See Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 316–17 (E.D.N.Y. 2025) (Choudhury, J.) (finding the petitioner's liberty interest had been infringed when she was detained at 26 Federal Plaza for six days); *Hernandez Lazo v. Noem*, No. 2:25-CV-6639, 2026 WL 303430, at *14–*15 (E.D.N.Y. Feb. 4, 2026) (Choudhury, J.) (finding the petitioner's liberty interest had been infringed when he was detained for twelve days, including twenty-three hours in deplorable conditions at a hold room in Central Islip); *Minarcaja Concha v. Lyons*, No. 2:25-CV-6695, 2026 WL 215417, at *16

(E.D.N.Y. Jan. 28, 2026) (Choudhury, J.) (similarly concluding that the petitioner's liberty interest was implicated when he had been detained for approximately nine days, including approximately twenty-four hours in the Central Islip hold room). Additionally, "[t]he liberty interest in freedom from detention 'is even more sharply pronounced where an individual was released from detention on the condition that [s]he comply with certain conditions . . . , the individual in fact complies with those requirements . . . , and the individual thus relied on the government's implicit promise that [her] release will be revoked only if [s]he fails to live up to those conditions." *Id.* at \*15 (quoting *Y- C- v. Genalo*, No. 25-CV-06558 (NCM), 2025 WL 3653496, at \*6 (E.D.N.Y. Dec. 17, 2025)).

Here, Ms. Wright's account of her detention at 26 Federal Plaza reveals a harrowing experience that severely affected her mental health even during her relatively short period of confinement there (approximately six days, from Friday, April 10, 2026, to Wednesday, April 15, 2026). She was held in a cell with four other women; they slept on foldable mats with silver foil blankets and thin white sheets without pillows. *See* Wright Decl. ¶ 5. The room was cold and unhygienic: "[t]here was an air vent that blew cold air into the cell," causing Ms. Wright to "shiver[] a lot," and the five women in the cell shared a single sink and toilet without any privacy. *Id.* 26 Federal Plaza does not have showers, and so Ms. Wright went without during her time there. *Id.* ¶ 6; *see also Mercado v. Noem*, 800 F. Supp. 3d 526, 572 (S.D.N.Y. 2025) (in preliminary injunction arising from class action litigation pertaining to conditions at 26 Federal Plaza, noting that "[d]efendants do not dispute that detainees at 26 Fed do not have the ability to bathe or shower at any point during their detention"). Ms. Wright had to ask a guard for underwear and was forced to wash the few undergarments she was issued in the sink. *See* Wright Decl. ¶ 6. She also describes being taunted by the officers at 26 Federal Plaza. *See id.* ¶ 8 ("If I looked in the direction of the

officers, sometimes they seemed angry and would say 'what do you want?' Other times, they would look at me and start laughing. I cried very often while I was in the cell.").

Ms. Wright experienced other restraints on her liberty to which she would not have been subjected had she not been detained. *See Rodriguez-Acurio*, 811 F. Supp. at 316 (in concluding that petitioner's liberty interest had been infringed, noting that she "experienced additional restraints that she would not experience if at liberty"). She was separated from her partner and the community of LGBTQ Jamaicans she has come to rely on since fleeing to the United States to seek asylum. *See* ECF No. 11-1, at 2, ¶ 3. She was only permitted outside of her cell when she asked to make a phone call, or when she was taken to court or to see medical staff or ICE officers. *Id.* ¶ 7. On those occasions when she was taken to locations outside of 26 Federal Plaza, ICE officers "put cuffs on [her] ankles and hands and chains at [her] waist." *Id.* ¶ 16. When she told the officers the chains and cuffs were causing her pain, they did not assist her. *See id.*

Under these conditions, Ms. Wright experienced a precipitous decline in her mental health during the time she spent detained at 26 Federal Plaza. *See id.* ¶ 9 ("I was feeling very sad and scared and overwhelmed."). She recalls her mind being "all over the place," and that she "could not stop crying." *Id.* ¶ 11; *see also id.* ¶ 12 ("[M]y mind kept going over and over how it felt when I was chained up at the arms and legs by ICE, and how ICE could take me to Jamaica and I would be murdered there."). Ms. Wright ultimately had to be taken to Bellevue Hospital for assessment. *See id.* ¶ 13; *see also* ECF No. 11-1, at 2, ¶ 4. Even now that Ms. Wright has been released from custody pursuant to this Court's Order of April 15, 2026, she reports "getting flashbacks to when [she] was chained up and when [she] was alone in that cell." Wright Decl. ¶ 17.

These appalling conditions, and their concomitant impact on Ms. Wright's mental health, "underscore[] why freedom from detention is a precious liberty afforded protection under the Due

Process Clause" of the Constitution. *Minarcaja Concha*, 2026 WL 215417, at *16. Moreover, Ms. Wright's already significant liberty interest is further heightened because she was previously released by ICE on her own recognizance, and ICE has made no showing that she violated the terms of the order releasing her. *See* ECF No. 8-2, at 4–7 (exhibiting Order of Release on Recognizance, or "ROR Order," dated March 25, 2023). Although Respondents' briefing suggests that Ms. Wright violated the condition requiring that she not "commit any crime," Resp'ts Opp. 2, the revocation notice itself does not specify what conditions Ms. Wright allegedly violated, *see* ECF No. 8-2, at 17. In any event, to the extent that Respondents rely on Ms. Wright's arrest to assert that she violated the terms of her ROR Order, this argument is unpersuasive because the arrest "has not resulted in any resulted disposition, much less a conviction." *Minarcaja Concha*, 2026 WL 215417, at *17.

Ultimately, ICE's detention of Ms. Wright for six days infringed on her "weighty private interest in personal liberty." *Id.* at *16; *see also Nosirov*, 2026 WL 916602, at *7–*8 (rejecting the notion that detention under the LRA was constitutional merely because it had not become unconstitutionally prolonged).

**B. Given the difficulties Ms. Wright would likely face in defending herself against unproven criminal allegations while subject to mandatory detention, the risk of erroneous deprivation she faces is exceptionally high.**

In Ms. Wright's reply brief, she argued that "[t]he risk of erroneous deprivation is high because [Ms. Wright] is being detained based solely on an arrest and charge for which [s]he is presumed innocent." ECF No. 11, at 5 (quoting *Alcantara Guerrero*, 2026 WL 931503, at *5). Ms. Wright will not recapitulate those arguments here and instead incorporates them by reference. However, she notes that the severe impact of ICE detention on her ability to vindicate her constitutional rights in criminal court, *see* Section III.C., *supra*, bears a direct relationship to the

risk of erroneous deprivation of her liberty. Not only has Ms. Wright "not been afforded the opportunity to contest [the] charge [against her]," were she to remain detained, it is highly unlikely she would be afforded that opportunity at all. *Alcantara Guerrero*, 2026 WL 931503, at \*5; *see also* Section III.C., *supra*.

As to the value of proposed safeguards, as Ms. Wright discussed in her reply brief, "[t]here is little cost and significant benefit from providing the procedural safeguard of requiring that any detention be preceded by an individualized determination by a [Department of Homeland Security] officer as to whether [Ms. Wright] poses a flight or safety risk." *Minarcaja Concha*, 2026 WL 215417, at \*17; *see also Rodriguez-Acurio*, 811 F. Supp. 3d at 317–18. Here, Ms. Wright was not afforded any meaningful process prior to her detention by ICE. The revocation notice for her ROR order was only provided to her after her arrest. *See* ECF No. 8-1, at 4–5 (stating that Ms. Wright was served during "post-arrest" processing); *see also Minarcaja Concha*, 2026 WL 215417, at \*17 (noting that the petitioner was not served with any document that accused him of violating the terms of his release, "much less one that was prepared before ICE arrested and detained him"). As in *Minarcaja Concha*, Respondents have not offered "any . . . basis for concluding that [Ms. Wright's] arrest[] constituted a violation of the ROR, nor any indication that the arrest[] suggested that [s]he was a flight or public safety risk." *Id.*

In sum, ICE's detention of Ms. Wright without any pre-deprivation notice or opportunity to be heard, on the basis of unproven criminal allegations that would be extremely difficult to defend against while detained, poses an intolerably high risk of erroneous deprivation of her liberty.

**C. The government interest in avoiding the societal costs of unnecessary detention further weighs in Ms. Wright's favor.**

In her reply brief, Ms. Wright noted that the only interest asserted by the Respondents was their interest in ensuring that she appeared for her removal proceedings—and that their own evidence indicated that Ms. Wright had consistently appeared for those proceedings. *See* ECF NO. 11, at 8–9; *see also Doe*, 800 F. Supp. 3d at 217 ("The government fail[ed] to explain why its proffered interest in securing appearance at removal proceedings and for deportation holds sway when a noncitizen is not a flight risk." (quoting *Hernandez-Lara*, 10 F.4th at 32)). She briefly supplements that argument here by noting that cabining ICE detention "to only those noncitizens who are dangerous or a flight risk might save the government, and therefore the public, from expending resources on needless detention." *Id.* (quoting *Hernandez-Lara*, 10 F.4th at 32); *see also Velasco Lopez*, 978 F.3d at 854 (recognizing that the government has an interest "in minimizing the enormous impact of incarceration when it serves no purpose"). When, as here, the government "incarcerates individuals it cannot show to be a poor bail risk," it needlessly separates noncitizens like Ms. Wright from their loved ones and communities. *Id.* at 855. Respondents have not articulated a "public interest that any of this serves"—that is, detaining someone who has not otherwise been shown to be a flight risk or danger, solely on the basis of unproven criminal allegations. *Id.*

**D. The appropriate remedy for Ms. Wright's detention without any pre-deprivation process is release.**

As Ms. Wright discussed in her reply brief, *see* ECF No. 11, at 9, "[r]elease from detention is the 'typical remedy' for 'unlawful executive detention.'" *Rodriguez-Acurio*, 811 F. Supp. 3d at 319 (quoting *Munaf v. Geren*, 533 U.S. 674, 693 (2008)). A bond hearing "would not remedy the core constitutional violation at issue" because "the detention without adequate pre-deprivation

procedures has already been carried out." *Rodriguez-Acurio*, 811 F. Supp. 3d at 319–20; *see also Minarcaja Concha*, 2026 WL 215417, at \*18–\*19 (ordering immediate release of petitioner with criminal history).

Further, at least two courts have ordered the immediate release of petitioners purportedly subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(E). *See Nosirov*, 2026 WL 916602, at \*8; *C.R.R.*, No. 2026 WL 752462, at \*3. The *Nosirov* court did not devote much analysis to that remedy, but the reasoning of the *C.R.R.* court is instructive. In *C.R.R.*, the court determined that ordering a bond hearing was unnecessary because the petitioner had already been released on bail pursuant to pending criminal charges. *Id.* Although, here, Ms. Wright has not yet been the subject of a criminal bail determination because she has not yet had her first appearance in criminal court, she was previously deemed to pose neither a danger nor a flight risk when she was released on her own recognizance by ICE. *See* ECF No. 8-2, at 4–7 (setting forth ROR Order). As discussed *supra*, Respondents have not made any showing that she violated her ROR Order, such that this Court can and should maintain the status quo that was in place before ICE unlawfully detained Ms. Wright earlier this month.

## CONCLUSION

Petitioner respectfully requests that the Court grant her Petition.

Dated: April 22, 2026
      Bronx, New York

                             Respectfully submitted,

                             /s/ Jessica Coffrin-St. Julien
                             Jessica Coffrin-St. Julien, Esq.
                             Nhu-Y Ngo, Esq.
                             The Bronx Defenders
                             360 East 161st Street
                             Bronx, New York 10451
                             Tel. 646-780-9930
                             jcoffrin@bronxdefenders.org
                             *Counsel for Petitioner*